## PEOPLE ex rel. TRAVIS v. DURSTON, Warden, etc.

*(Supreme Court, Special Term, Monroe County. November, 1888.)*

1. **OFFICE AND OFFICER—APPOINTMENT—DISCHARGED SOLDIERS—CONSTITUTIONAL LAW.**
   Laws N. Y. 1887, c. 464, providing that in every public department of the state, and of its municipal corporations, honorably discharged Union soldiers and sailors shall be preferred for appointment and employment, provided they possess the necessary business capacity, is, as applied to keepers in the state-prisons, repugnant to article 5, § 4, of the constitution, which provides that a superintendent of state-prisons shall be appointed by the governor; that he shall have the superintendence, management, and control of such prisons, "subject to such laws as now exist, or may hereafter be enacted," and appoint the agents, wardens, physicians, and chaplains; and that the agent and warden of each prison shall appoint all other officers, except the clerk, subject to the superintendent's approval.

2. **SAME—IMPLIED POWERS—REMOVAL.**
   The power conferred upon the agents and wardens to appoint, the term and tenure of their appointments not being defined, necessarily implies the power of removal.

3. **SAME—WANT OF BUSINESS CAPACITY—MANDAMUS.**
   Relator, an honorably discharged Union soldier, was dismissed from his position of keeper in the Auburn state-prison, and brought *mandamus* to compel his reinstallment under the act of 1887. Respondent's opposing affidavit alleged that relator did not possess the requisite qualifications for the position, that he did not possess the business capacity to discharge the duties thereof; and that his presence would be demoralizing to the discipline of the prison. Relator, without denying these allegations, asked for a peremptory writ. *Held* equivalent to a demurrer, and an admission of the truth of the opposing allegations, and, even if the act were valid, relator's discharge was warranted.

On motion by the relator, Simpson D. Travis, for a writ of *mandamus* requiring the respondent, Charles F. Durston, agent and warden of the Auburn state-prison, to reappoint relator a keeper therein.

*A. J. Parker,* for relator. *John W. Hogan,* Dep. Atty. Gen., for respondent.

ADAMS, J. From the papers which were brought to the attention of the court upon the hearing of this application, it appears that in the year 1880 the relator was appointed by a former agent and warden of the state-prison at Auburn a keeper therein, and that he occupied that position, performing the duties thereof, down to the 6th day of August, 1888, at which time he was relieved from further duty by the order of the respondent, who was then the agent and warden at such prison; that the order relieving the relator from duty was in writing, and alleged, as the reason therefor, a direction on the part of the superintendent of state-prisons to reduce the force of keepers and guards to the lowest possible number for its government and discipline; that at the time the relator was so relieved from duty as such keeper he was an honorably discharged Union soldier of the war of the Rebellion, and was not incapacitated from the discharge of his duty in any way, and that at that time other persons were retained in the employ of the prison, as keepers and guards, who were not honorably discharged Union soldiers of the war of the Rebellion; that the relator has not since been reinstated or appointed a keeper of such prison. The facts thus stated are relied upon as furnishing a sufficient reason for the interposition of the court, in the matter of the appointment of a public official, and call for a judicial interpretation of the language of chapter 464 of the Laws of 1887, which, it is contended, has been confessedly violated by the action of the respondent in relieving the relator from duty as a keeper of the Auburn state-prison, under the circumstances herein set forth. The first section of the act thus relied upon reads as follows: "In every public department and upon all public works of the state of New York, and

of the cities, towns, and villages thereof, and also in non-competitive examinations under the civil service laws, rules, or regulations of the same, wherever they apply, honorably discharged Union soldiers and sailors shall be preferred for appointment and employment; age, loss of limb, or other physical impairment which does not, in fact, incapacitate, shall not be deemed to disqualify them, provided they possess the business capacity necessary to discharge the duties of the position involved." The second section of the act makes it a misdemeanor on the part of any official or other person having power of appointment to disregard either the letter or spirit of this act.

It is very plain that it was the design of the legislature, by means of the enactment in question, to make provision whereby the honorably discharged Union soldiers and sailors of the war of the Rebellion would obtain preference over all other competitors for appointments in the civil service of the state,— a provision which certainly should have the co-operation of all other branches of the state government, provided the act by which it is created is in no respect in conflict with the fundamental law of the state. It will be seen, therefore, that the decision of this application necessarily involves the consideration of a question, than which none can be more important, namely, the constitutionality of a deliberate act of the legislature. As has been said by an eminent jurist in a recent case, (*People* v. *Angle,* 17 N. E. Rep. 413,) the duty thus imposed upon the court is one which, within settled rules, "requires a case to be made showing clearly that the statute, when fairly and reasonably construed, is brought into conflict with some provision of the constitution, before the court can be justified in pronouncing it an unauthorized expression of legislative will. If the act and the constitution can be so construed as to enable both to stand, and each can be given a legitimate office to perform, it is the duty of the court to give them such construction; but, if this cannot be done, it is equally our duty to declare the supremacy of the constitutional provision, and the nullity of the statute. While every presumption is in favor of the constitutionality of the law, if, nevertheless, it appears that its enforcement must necessarily produce a conflict with the letter or spirit of the constitution, it is the duty of the court to condemn the law."

With this most excellent statement of the rule which should govern the court in its action upon a question of this importance for our guide, let us ascertain in what respect, if any, this statute in question comes into conflict with any provision of the constitution. With this end in view, it will be profitable, perhaps, to examine with some care the language of the constitution itself, so far as it has any bearing upon the question at issue. By section 4 of article 5 it is provided that "a superintendent of state-prisons shall be appointed by the governor, by and with the advice and consent of the senate, and hold his office for five years, unless sooner removed. He shall give security in such amount and with such sureties as shall be required by law for the faithful discharge of his duties. He shall have the superintendence, management, and control of state-prisons, subject to such laws as now exist or may hereafter be enacted. He shall appoint the agents, wardens, physicians, and chaplains of the prisons. The agent and warden of each prison shall appoint all other officers of such prison, except the clerk, subject to the approval of the same by the superintendent." Prior to the adoption of this provision of the constitution the prisons of the state were under the control and management of inspectors, who, under an earlier constitution, were elective officers, and as such were clothed with the power of the appointment of keepers, within certain limitations. The section which is above quoted, and which works a radical change in the management of the prisons of the state, is the outcome of the constitutional convention of 1872–73, as amended by the vote of the people in 1876. By reference to the journal of that convention, at page 296, it will be observed that the reason for instituting a change so radical in its character is stated to be that "it is generally

conceded that the management of the prisons by a board of inspectors has been a disastrous failure. Under the change proposed, the superintendent will be at all times directly responsible to the governor, and he to the people, for the proper and faithful discharge of the important duties pertaining to this branch of the public service." It will thus be seen that it was the design of the convention to repose the authority which had theretofore vested in a board of public officers in one official, namely, the superintendent of state-prisons. He was given the sole superintendence and management of the prisons, and was required to give security for the faithful discharge of his duty. One of the duties which were thus imposed upon him was the appointment of the agents, wardens, physicians, and chaplains of the prisons, and again the agent and warden was charged with the appointment of all subordinate officers, except clerk, subject to the approval of the superintendent. This being the case, it is of the utmost importance that the constitutional provision in question should be strictly observed, both in letter and spirit, and that the same should not be permitted to be abrogated by legislative action, however wise in theory or beneficent in results such action may be.

Now, by reference to the language of the act in question, it will be observed at once that the legislature has arrogated to itself the appointment of subordinate officials in the different departments of the state, by designating a class from which the head of any department charged by the constitution with the appointment of subordinates shall select those who are to assist him in carrying on the affairs of his department; and, if the legislature may name a class from which these subordinate officials are to be selected, no good reason can be furnished why it should not select and name the persons who should fill those positions. So that, instead of the power and authority for the proper management of the prisons of this state being concentrated in one individual, they are concentrated in the legislature; and, if this is so, then it appears most clearly that the act upon which the relator bases his claim for reinstatement is in direct conflict with the fundamental law of the state. It would not be difficult to suppose a case in which, if the statute in question were to be observed, the superintendent of state-prisons, or the warden of any one of those institutions, might be practically deprived of the exercise of any judgment or discretion in the selection of subordinates for whose conduct, in the management of their respective duties, he is directly responsible. But the facts of this case will perhaps furnish a good illustration for the purposes of this discussion. It appears that in the management of the Auburn state-prison the respondent was directed by his superior officer, the superintendent, for reasons which it must be assumed were entirely proper and adequate, to reduce the force of keepers and guards to the lowest possible number for its proper government and discipline. In making this reduction of the working force of the institution of which he was the official head, the constitution clearly provided that he should exercise his judgment and discretion in the interests of the people whose servant he was, and in so doing he discharges the relator, and retains another official of the same grade. But the legislature intervenes, and by its solemn enactment says that he must not exercise his judgment and discretion in this matter, but, on the contrary, if it becomes necessary for him to retain one of two keepers and discharge the other, he must select the one who is to be retained from a particular class of citizens. Now, so far as this statute seeks to make suitable provision for those who have risked their lives in the defense of their country, it certainly cannot, with any reason, be objected to, provided it does not come in conflict with the organic law of the state; but if it interferes with, and tampers, limits, or controls, the action of the respondent in the discharge of an official duty which is imposed upon him, it certainly does contravene the constitution, and cannot be regarded because in its design and scope it is meritorious.

It is contended by the relator's counsel that the constitution, although con-

ferring upon the warden the power of appointment, does not in terms include the power of removal. But it is not essential to the exercise of the power of removal that it should be conferred either in the constitution or the statute, for the power to appoint to office or place, where the term and tenure are not defined, necessarily carries with it the power of removal. *People* v. *Fire Com'rs*, 73 N. Y. 437. The foregoing reasons would seem to furnish ample authority for the denial of the relator's application, but a recent adjudication by the court of last resort in this state, in a case similar in many respects to the one under consideration, although involving a different statute as well as a different provision of the constitution, seems to be in all respects conclusive upon this question, even if this court were disposed to take a different view than that which it has already expressed. *People* v. *Angle*, 109 N. Y. 564, 17 N. E. Rep. 413.

It is further contended by the counsel for the relator that section 6 of article 5 of the constitution gives support to the legislation under consideration. This contention is effectually disposed of in the case last cited, and the reasons which are given for the conclusion reached by the court in respect to that question furnish a satisfactory answer to any contention which might be made that the language of section 4, which provides that the superintendent shall have the "management and control of the state-prisons, subject to such laws as now exist or may hereafter be enacted," is applicable to the matter of appointments of individuals to subordinate positions.

But, even were the court in error in its interpretation of that provision of the constitution which is applicable to this case, there would seem to be another objection to the granting of the relief sought, which must necessarily dispose of the case so far as the rights of the relator are concerned. The appointment of an honorably discharged Union soldier or sailor to official position, within the contemplation of the act of 1887, is made conditional upon his possessing the business capacity necessary to discharge the duties of the position involved. In the opposing affidavit of the respondent it is alleged that the relator did not possess the requisite qualifications to entitle him to an appointment to the position which he held, or, in other words, that one of the reasons which controlled the respondent in his selection of the relator for removal was that he was less competent to discharge the duties of keeper than others retained by him; that, in his opinion, he did not possess the business capacity to discharge the duties involved in the position of keeper; that his presence would be demoralizing to the discipline and good government of the prison, and would seriously embarrass the respondent in the proper discharge of the duties of his office. This allegation on the part of the respondent is not denied by the relator. On the contrary, he proceeded to argument, and asked for a peremptory writ, which is equivalent to a demurrer, and is an admission of the truth of those allegations as statements of fact; and, that being the case, the respondent was certainly acting within the spirit, if not the precise letter, of the statute in question. *People* v. *Board of Apportionment*, 64 N. Y. 627. For these reasons the application for a writ of *mandamus* must be denied, with costs.